Naveen Ramachandrapa v. Snap, Inc. Naveen Ramachandrapa v. Snap, Inc. Snapchat is a social media company that focuses on sending photos and videos. The messages are called snaps. And they are famous for the fact that teenagers love Snapchat, while most adults barely know how to use it. And one of the main reasons that teenagers really love Snapchat is because of its filters. For the most part, Snapchat's filters are fun, creative, and exciting. You probably saw or heard about the cat filter that a Texas lawyer inadvertently stuck during a hearing. You know, that's the kind of filter that Snapchat pioneered. Now, this case is about something much more serious and, frankly, deadly. It's about Snapchat's speed filter, which is a filter that Snapchat created that allows a user to instantly overlay their physical, real-life speed. And it shows them how fast they're going, and they can instantly send that message to their friends. Now, beginning in 2015, the speed filter became a bit of a viral sensation. It was like a game. The speed filter was encouraging teenagers and college students to drive at over 100 miles per hour for the specific purpose of sending a 100-mile-per-hour snap to their friends. And the consequences of that game were deadly. In 2015, there was a near-fatal crash in Georgia. In December 2015, there were three deaths in Pennsylvania. In October 2016, there were five deaths in Florida. And that brings us to this case where two 17-year-olds and a 20-year-old died in Wisconsin in May 2017. So with that background in mind, let me now turn to the communications decency act. The basic rule of the CEA is that an Internet provider cannot be liable for user content. That's it. That's all the text of the statute essentially provides. Well, that rule doesn't apply here. We are not holding or trying to hold Snapchat liable for what any user posts. The post itself, the snap, that's not harmed anyone, and that's not the basis of our claim. Our claim is that the speed filter itself, the actual filter, that's what's encouraging the dangerous speeding in this case. And Snapchat created that, not anyone else. We are seeking to hold Snapchat liable for its own content. Now, it really is that simple, but I think it's useful if you break down, as we did in the briefs, the allegations of the complaint into breach and causation, just to sort of give you a line-by-line example of why we're not holding Snapchat liable for a post. So let's look at the breach allegations. So again, this is a state law claim. So we're essentially saying under tort law that they breached the duty of ordinary care. So number one. May I ask a question? Is this a product defect claim, products liability claim? Yes, Your Honor. It's not a strict products liability claim, but it is a defective design, so it does sound inevitable. Defective design, okay. So here's a good transition to how that product design claim exists. One of our defective design allegations is that they should have, in the exercise of ordinary care, made the speed filter inoperable at dangerous speeds. So 10 miles per hour is an easy example. Just make it so it doesn't work at 10 miles per hour or higher, and that would have greatly reduced and stopped this from happening. That doesn't involve anyone else's speech. That involves Snapchat's own product, their own design code, and their own, you know, literally their own computer code. So that's one example. Number two, just remove the speed filter entirely. Under a traditional risk utility design defect test, you look at the benefit versus the danger. Well, there is no benefit to the speed filter, and the danger is clear. This was at least the third or fourth time that there was a high-speed crash of this nature where the speed filter had been linked. And the third example of our breach allegations is a warning. We say that Snapchat needs to issue a clear warning, so every time you open the speed filter, it tells you don't drive while you're using the speed filter. It's almost like in your iPhone, which many people probably have. If you're trying to use it while you're driving, it says, you know, it gives you a warning. Again, that's all Snapchat's speech. That's not anyone else's. Now, opposing counsel is probably going to say, well, we do give a warning, and it's true that there is a warning the very first time that or alleged to be a warning the very first time that you use the speed filter, but that's not enough, and that's also not a question about the Communications Decency Act. That's a question about negligence, and when you're looking at the immunity, you don't look to whether the claim is a good one. You ask to whether there is immunity from that claim, and I'll point the court to the Doe versus Internet Brands case. In that case, this court in the Ninth Circuit said that the CDA did not apply to Internet Brands, which was operating as model mayhem, to warn its users about a sexual predator, and one of the things the court said in that was, well, look, it's your own warning, and they're saying you should have warned us, and so that's your speech. It doesn't have to do with user speech, and so the same applies here. I want to transition to the same topic, but I want to frame it in our causation allegations, so I just talked about why under a design defect breach analysis we're only talking about Snapchat speech. You can also see that in the causation. Causation is really simple in this case. I mean, the allegations are clear. It may be complicated as a factual matter, but just in terms of what it is, it's quite simple. It's two steps. Snapchat's speed filter encourages dangerous feeding. The dangerous feeding results in death. That's it. Now, we don't say what's missing from that is we never say and we don't claim that the post harms anyone, and why would we? Posting something doesn't harm anyone. It's the speaking that does it, and so that's the issue in this case. Now, the district court, when they were looking at this issue, the order says, well, they're motivated to post on Snapchat, and that may be true. It's obviously true, I think, but that's not what the CDA says. The CDA doesn't say that any time someone's motivated to post, there's immunity. It doesn't say, you know, some connection. It says treating them as making that speech, and our claim doesn't rest on the actual posting, and you can see that by the fact that if they crashed before they hit the send button, our claim would be the same, and that's the Georgia case, Maynard versus Snapchat, which obviously is just persuasive authority, but it's really persuasive authority. It addresses this exact same issue and concluded that the speech at issue was Snapchat's, not the user's. So that's the first thing the district court did wrong, in our opinion, and the second thing is the district court relied on the case of Dyroff, which is also Snapchat's main authority. That case is distinguishable for the fact that in that case the claim did depend on what was actually in the user's speech. So the Dyroff case involves a case where the decedent, the plaintiff's son, deceased son, posted a message that said basically, quote, where can I score some heroin? So post that to the message board, then the drug dealer responds, here's where you can get some heroin. And the decedent later died from a heroin overdose. The reason why the CDA applies in that case is because it actually depends on what's said in that message. It is the post that causes that harm. If no one ever responded to that post or the post was never made, there would be no heroin involved. But the difference in our case is that the speech filter has a motivating effect by itself. It is the speech, Snapchat's speech, that causes that to occur. And going back to the Maynard versus Snapchat case, that's the Georgia case, the court made that same analysis. There are a lot of these cases. I suspect my opposing counsel will cite many of them. There's a Facebook case and so on, and all those cases, those all involve cases where the message itself, what was actually said in the message is what was motivating people, but that's not what we have here. It's the speech filter itself that encourages the dangerous behavior. So with that, unless there are any questions at this time, I will reserve the remainder for rebuttal. All right, thank you, counsel. Mr. Blavin. Yes, Your Honors. Good morning, Your Honors. Jonathan Blavin on behalf of Defendant Appellee Snap. The Communications Decency Act prevents Internet platforms like Snap from being held liable for providing neutral tools that facilitate the creation and publication of third-party content. What Dyroff held was that the CDA protects, quote, content neutral tools used to facilitate communications. And critically, the court said that in providing such tools, the platform is, quote, acting as a publisher of others' content. And the district court here correctly held that the speed filter on its face is neutral. It can be used for both proper and improper purposes, low or high speeds, and it doesn't require anyone at all to use the filter, much less post a high-speed snap. And the complaint here, as I think plaintiff's counsel acknowledges, is entirely predicated on the ability of users to post and share information on Snapchat. The complaint is replete with allegations to this effect, and that's why the district court correctly held that the crux of plaintiff's claims is that they want to use the filter to post and share information. If the court looks at, for example, paragraph 26 of the complaint, it alleges that Snap negligently allows users to, quote, share on social media a photo or video with their real-life speed as a Snap. At paragraph 53, the complaint similarly alleges that Snapchat users are, quote, motivated to drive at an excessive speed to obtain recognition and to share their speed through Snapchat. So the complaint, as plaintiffs acknowledge, is completely predicated on the ability of Snapchat users to share their own information on Snapchat. Now, plaintiff's counsel made several arguments to the effect that, well, we're not challenging the actual Snap itself. The Snap isn't harmful. That's only what the CDA protects. That is incorrect. This court made clear in Dyaroff and in several other decisions that publication functions under the CDA apply broadly to any ability of users to publish information on the platform. For example, let me ask you a question. How is the plaintiff in this action trying to treat Snap as a publisher or a speaker? They're doing that through two ways. First, they're doing that because they're challenging the ability of Snap to allow users to publish information and share information. Wait, they're not challenging that. The complaint is about the design of your speed filter that causes death. That's what the complaint's about. It's not challenging at an abstract level Snap's role as an Internet provider or as a facilitator of other messages. There's not even a particular message alleged in this complaint. Well, what the complaint says is, and this is made clear by the reply, that they don't want information published through the filter. That's challenging our ability to provide that tool and allowing users to use it. And courts have said, for example, the Second Circuit in the Herrick versus Grindr case. In that case, the plaintiff similarly alleged product defect claims that the Grindr app allowed users to share their geolocation information. And that this facilitated stalking offline. The harm occurred from offline conduct. It didn't occur as a result of the specific content was not alleged to be harmful. They brought a product defect claim. And what the Second Circuit held affirming the district court's ruling is what they're ultimately challenging is Grindr's ability to publish this information to third parties. The information, in this case, the geolocation information is from the user. You're regulating what users can publish on the platform. That's why the district court here said they're challenging the ability of users to use this filter, which can be used for numerous safe purposes on a plane, on a train. We provided examples of that. They're directly regulating the ability of users to use that tool. It is a neutral tool, indisputably. And the act of providing that neutral tool under Dyer off other authorities is what is a publisher function. The court doesn't simply look at the content that's posted as to whether or not that content is harmful. So, for example, in roommates, the court said that a publisher function protected by the CDA includes, quote, any activity that can be boiled down to deciding whether to exclude materials that third parties seek to post online. The material roommates was a case where they were held not to be immune under the CDA because they were publishing illegal speech. In roommates, the court said that for part of the challenges at issue, these are the questions. I realized there were two parts of it, but what it was saying was that you don't have immunity where there is unlawful speech. It said you don't have immunity where you require the user to post unlawful speech. Right. And there the questions were inherently illegal, and it required the posters to post illegal information under the federal fair housing laws. So it wasn't neutral. It wasn't neutral here. The tool can be used for any purpose. It's not. Snap isn't requiring users to speed. In fact, as plaintiffs acknowledge that provides to warning to users, telling them not to snap and drive using the filter. So what about the aspect of the program that provides incentives and awards? Or what is it for your likes or the incentive program? What about that part? But there's your honor. There's absolutely no allegations in the complaint, nor could they allege any allegations. And they were given leave to amend to include this, that Snap does anything to encourage users to provide any rewards, trophies, et cetera, for speeding. And, again, Snap provides warnings telling people not to speed using the app. Plaintiffs themselves acknowledge this in their complaint. In paragraph 31, they say, you know, even if Snap does not actually encourage or reward its users or provide any trophies for speeding. Now, if Snap did do that, if Snap had its own content that said, you know, go up to 150 miles per hour and you'll get a trophy or a reward, that would be Snap's own content. The CDA would not apply there because Snap created that content. But the only thing that the complaint challenges, and this is what the district court held, these allegations of encouragement were just completely conclusory and vague. The only thing that the complaint is challenging is the provision of the filter itself, which is a neutral tool. And what the court did is. Let me ask you, if we accept your argument. Could a digital platform ever be held liable in a product liability action? Yes, Your Honor. If the digital platform was being challenged for its own content and not the provision of a tool that just allows users neutrally to publish content. So, in the example I just gave, if they were pointing to something beyond the provision of a tool which neutrally allows people to share their own content, then the CDA wouldn't apply there. If we had encouraged people with trophies or rewards and they had shown that, that we provided our own content for that, that would be completely different. And what the court said, the district court said, looking to roommates, it said, a clever lawyer, and this is from the roommate's decision, can always argue that something the website operator did encouraged the illegality. But in cases of enhancement by implication or development by inference, the CDA will apply because you want to draw a line that's clear. Okay, so that I'm clear, what is the precise content you are pointing to? So, there was a snap year published, 123 per mile per hour snap, and the accident under their own allegations occurred shortly thereafter, the snap being taken. But at the end of the day, the fact that there was... So, the content that's protected is the 123 mile snap, that plaintiffs can't hold snap liable for the 123 mile snap chat. So, there's that, your honor, but it's more broadly than that. And this is how this court and multiple other courts have construed the CDA. It's not simply the snap at issue. It's the fact that what they're challenging is our provision of a neutral tool that facilitates the publication of that snap. What the district court said is, for example... And so, counsel, is Dyeroff your best case, or can you point me to another case that's more directly on point? So, Dyeroff clearly held that the act of providing these tools is itself acting as a publisher function protected by the CDA. With respect to the issue of the harm, the content at issue, the district court, for example, cited to the DOTU versus MySpace case from the California Court of Appeal. There, the allegation was, we were harmed offline as a result of an assault. It had nothing to do with the information exchanged online. But what the court said is, it doesn't matter if the information exchanged online is non-tortious. It doesn't matter if you're challenging particular content. The question is, under the CDA, are you challenging a publisher function? That means that you are treating the party as a provider of third-party content. The court said, the fact that the information exchanged is non-tortious, non-harmful, doesn't matter. The question is, is the challenge to the website's activities treating them as a publisher? And here, clearly, all we did was provide a tool that allows users to publish content. That's no different than in Herrick, for example, where the challenge was you provided geolocation functionality. They brought a product defect claim. Yes, Your Honor. I'm sorry, I have a question. I'm going to try to articulate it. As you refer to content that is illegal, that is not neutral content when it is illegal content, correct? Did I understand you correctly? The neutrality is within the tool. The fact that users misuse that tool in particular ways for potentially improper purposes? Maybe I misunderstood your argument earlier. The fact that they're going 123 miles an hour is illegal. That's illegal to go that fast. I guess I'm struggling with the fact that the tool in the app allows someone to publish that illegal act. Can you address that? Yes, Your Honor. And the reason why the CDA still applies is because what this court and other courts have told is when the tool itself is neutral, it can be used for proper or improper purposes. The CDA applies. In Backpage, for example, from the First Circuit, the court said, quote, claims that a website facilitates illegal conduct through its posting rules necessarily treat the website as a publisher or speaker. In Dyroff, the information posted under the allegations was illegal. The content was illegal, but the tool was neutral. And what this court made clear in Roommates is that just because the tool is neutral, that means that the CDA protects it. If the tool required people to post snaps at a particular speed or even, you know, let's say there was content from Snap encouraging people to do that, that would be a different case. The CDA in that case would not apply under Roommates, and Snap could be held liable for its own content. But when the challenge conduct is simply a neutral tool, the CDA still applies. And to just briefly address internet brands, because I know they rely on that case quite a bit, there the challenge wasn't to a content-neutral tool. The challenge was a duty-to-warn claim, which was triggered by information that they received outside the website. And what the court said was, well, it's not requiring you to regulate how people are using the website, what tools they're using on the website. Whereas here, the district court correctly said that their claim, they're trying to prevent people from posting snaps at particular speeds. That's regulating how people use a content-neutral tool. That's exactly what the CDA says you can't do. It's regulating publication activity on the platform. And that's what the CDA protects against. And again, with respect to the failure-to-warn claim, the Herrick v. Grindr case, again, that was a product defect case. They had a failure-to-warn claim asserted there, and the court said, yeah, but ultimately what you're trying to say is people shouldn't use the neutral tools that the Grindr app provides in an improper way. That's requiring the app developer there to regulate how people are using those tools. That regulation means that you're regulating content. And just briefly, again, this notion that the content itself has to be somehow unlawful, that construes the CDA way too narrowly. For example, in the Sikhs v. Justice case, the Ninth Circuit affirmed a ruling. This is cited in our letter regarding Justice Thomas' statement there. Facebook removed content and blocked content from being published. And the plaintiff in that case sued and said they weren't saying, oh, I was harmed by that content. They were saying that's my content. You are unlawfully removing my content. And what the Ninth Circuit said, what the district court said is the ability to allow users to publish or to remove content or to block content, it's all a publisher function. The content itself doesn't have to cause harm, according to the plaintiff's theory. The question is, are you treating the website as a publisher in that you're trying to regulate a publication activity? And unless there are further questions from the court. Does anybody have a question? Okay, thank you very much, Mr. Blavin. Counsel? Yes. So a couple of points on rebuttal. I want to first start with the Fair Housing versus Roommate case and Snapchat's arguments about the Neutral Tools case. And I think it's really important to keep in mind that there are actually three claims in the Roommate's Fair Housing case. The first was that the questions that Roommate poses themselves were illegal and violated housing laws. And number two, that the publication of subscribers' discriminatory preferences was unlawful. And then number three, is they had this blank additional comments page. So three claims. Number one, the questions. Number two, the publication of users' statements. And number three, this blank box. On that first type of claim, the court, the Ninth Circuit, this court, held en bas that that violated or that that was not subject to amendment. The CA did not apply. And there was no discussion of the Neutral Tools test. That's because the Neutral Tools test does not apply when the claim is about the provider's own speech. The only time that the Neutral Tools test applies is when you have these other types of claims. So the second and third type of claim in Fair Housing, where it does involve the user's speech, then the question is, okay, so when is it joint speech? When is it both the provider's speech and the user's speech? That's the only time that you look at the Neutral Tools test. You don't look at the Neutral Tools test when it's the speech of the provider itself that's unlawful. And that's our claim. Our claim is that the speech filter itself, nothing more, itself violates tort law. It is illegal. It is illegal under tort law in the same way that this court held that the questions that roommate posed violated the Fair Housing Act. I think if you take a close look at that opinion, I know it's long, and many of you may have been on that actual case as well. But if you look at just that very first part of the opinion, there's no discussion of the Neutral Tools test. And you won't see the Neutral Tools test in, for example, the home away case, which is one of the short-term rental cases. It's like an Airbnb type of case. And a couple other cases cited in our briefs.  And Dairov is also similarly the empty box where the user puts in, you're providing the neutral empty box. So that goes in that category. But I'm just curious, do you agree with your opposing counsel that the speed filter is actually content neutral? No, it's not neutral because the question about neutrality is whether the tool itself violates the law. So the answer is no, it's not neutral. It is itself an illegal content under state tort law. It violates products liability law. What I agree with with counsel is, and Snapchat is correct, that you can use the speed filter in non-illegal ways. That's obviously true. But that's not our claim. The claim that they're describing is if we were to say, okay, well, you can post things that are not illegal. That's correct. You can post a Snap going zero miles per hour. But our claim is that the Snapchat tool, the speed filter, is itself illegal. Now, what you've seen, I think, is effectively, and part of it's because the CDA is a little bit confusing, is questions about whether that is a good claim. Whether that states a claim under tort law. That's not the issue. When you decide an issue about immunity, you decide whether the claim, accepting it both legally and factually, whether that's illegal. And because it's illegal, it's not content neutral. The last thing I want to end with is the Doe versus Internet brands. One of the last things opposing counsel said was, well, in that case, they got outside information about the sexual predator. And the question was whether there should be a warning given. That is one of our claims. One of our claims is that Snapchat learned from news outlets, learned from a petition calling for them to get rid of the speed filter, that they needed to do something. And one of the things we say that they needed to do is that they needed to issue a warning. Their own speech, their own message that says, every time you use the app, don't do this. And that has nothing to do with regulating what someone does. So I think our claim survives as a whole. But at the very least, that claim certainly survives. And the Internet brands case gives an important lesson. It says, quote, publishing activity is the butthole cause of just about everything Internet brands is involved in. It is an Internet publishing business. Without publishing user content, it would not exist. And the hypothetical that opposing counsel gave your honors about, okay, well, if there had been a trophy specifically for going 123 miles per hour, then we would be liable, they would argue that's immune as well. Because they would say, well, that trophy came from speech. It came from the post. Everything an Internet company does is about user content. There's always going to be some connection. What this court has held is, you look at the specific claims and also the language of the statute. And the language of the statute on its own does not apply. It's their extra gloss that they want to add on to that. So unless there are any other questions, I think I am done. And I think everybody's done. It's the last case. Your Honor, if I may, can I just clarify one point? This will take me ten seconds. Well, counsel, you know that's not appropriate. Then I will pass. I apologize. If you wish to file a supplemental brief, I suppose we would have to give both counsel supplemental. No, Your Honor. I just wanted to clarify one discussion of a case. But that's fine, Your Honor. I apologize. Was it roommates? It was Dyaroff. That's all. It was Dyaroff? Okay. Give it quick. I was just going to say, Your Honor, you raised the question, was it just a neutral box that people provided the information in? And in Dyaroff, the challenge was actually to the fact that they provided anonymous accounts, recommended particular content to people based on algorithms, and provided notifications. And the plaintiff there was saying those activities of the platform are what were challenging. And what the court said, those are all neutral in operation and they're protected by the CDA, their publisher functions. That's all I wanted to say. All right.  Thank you, counsel. Thank you, Your Honor. I thank both counsel for an interesting argument. Lemon v. Snap is submitted, and this session of the court is adjourned for today.
judges: Wardlaw, Bea, Cain